Scott L. Hazan
Brett H. Miller
Jenette A. Barrow-Bosshart
Otterbourg, Steindler, Houston
  &amp; Rosen, P.C.
230 Park Avenue
New York, New York 10169
(212) 661-9100

Malcolm M. Mitchell, Jr., (VSB No. 18098)
Byron L. Pickard, (VSB No. 47286)
Vorys, Sater, Seymour and Pease LLP
277 South Washington Street, Suite 310
Alexandria, Virginia 22314
(703) 837-6999

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# ALEXANDRIA DIVISION

---------------------------------------------------X

| | |
|---|---|
| **In re:** | Chapter 11 |
| | Case No. 02-83984 (SSM) |
| **US AIRWAYS GROUP, INC., et al.** | Jointly Administered |
| | Hon. Stephen S. Mitchell |
| **Debtors.** | |

---------------------------------------------------X

### OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF US AIRWAYS GROUP, INC., ET AL. TO THE APPLICATION OF CHUCK JONES FOR (A) APPOINTMENT OF SHAREHOLDER COMMITTEE; (B) APPOINTMENT OF A TRUSTEE OR EXAMINER; (C) REMOVAL OF DIP FOR BAD FAITH ACTS AND UNJUST ENRICHMENT; (D) REJECTION OF PLAN OF REORGANIZATION AS INADEQUATE AND FOR VIOLATION OF ABSOLUTE PRIORITY RULE; (E) EQUITABLE SUBORDINATION OF DISTRIBUTION OF SHARES TO MANAGEMENT AND UNIONS; (F) TO DISCHARGE PLAN SPONSOR; (G) FOR STAY OF CHAPTER 11 PROCEEDINGS; (H) FOR PERMISSION TO FILE ADVERSARY PROCEEDINGS; AND (I) ALTERNATIVELY TO DISMISS CHAPTER 11

The Official Committee of Unsecured Creditors (the "Committee") of US Airways

Group, Inc., et al. (the "Debtors"), by and through its undersigned counsel, hereby objects (the

"Objection") to the Application of Chuck Jones for (A) Appointment of Shareholder Committee;

(B) Appointment of a Trustee or Examiner; (C) Removal of DIP for Bad Faith Acts and Unjust Enrichment; (D) Rejection of Plan of Reorganization As Inadequate and for Violation of Absolute Priority Rule; (E) Equitable Subordination of Distribution of Shares to Management and Unions; (F) to Discharge Plan Sponsor; (G) for Stay of Chapter 11 Proceedings; (H) for Permission to File Adversary Proceedings; and (I) Alternatively to Dismiss Chapter 11 (the "Application"). In support thereof, the Committee alleges as follows:

## INTRODUCTION

1. In his Application and the document styled a Memorandum of Law in Support of Application, Mr. Jones seeks omnibus relief in numerous forms to, in essence, derail the Debtors' reorganization efforts. Understandably, Mr. Jones is frustrated that his equity holdings are worthless, but this is a risk investors take. All of the prayers for relief contained in the Application are based on vague and unsubstantiated allegations by Mr. Jones of unfairness, fraud, conspiracy and racketeering. In essence, these allegations reflect the anger of an "out of the money" investor struggling to comprehend the bankruptcy process in general and the specific processes undertaken by the Debtors to reorganize. These are very challenging cases. The airline industry is plagued by a poor economy, a cutback in travel, losses and higher security costs directly resulting from the September 11, 2001 attacks, increasing discount air carrier competition, and the threat of war. The Debtors' debt structure is also challenging because of, among other things, significant secured debt and labor related obligations. Nonetheless, the Debtors' relatively new management team had more than a strategy to reorganize the companies on a fast track when the Debtors filed their chapter 11 cases on August 11, 2002 (the "Filing Date"). They had a restructure proposal (hereinafter defined as the MOU), which, among other things identified a proposed plan of reorganization sponsor, TPG (hereinafter defined), which

would assist in obtaining certain debtor-in-possession financing and provide a significant investment in the reorganized Debtors. The Debtors also created a procedure whereby the TPG investment proposal and financing would be subject to higher and better bids. The process worked, but not in the way either the Debtors or TPG envisioned. After the Committee was formed, the Committee worked with the Debtors to improve the bidding process. During this time period, RSA (hereinafter defined) indicated to the Committee its interest in becoming not only the plan sponsor, but the stalking horse bidder. After negotiations with the Committee and then the Debtors, and Bankruptcy Court approval after notice and a hearing, RSA became the stalking horse bidder. Thereafter, an open sale process was conducted. There was nothing underhanded about this process. Similarly, the actions of the Debtors, their management, RSA and the unions have been consistent with the parties' respective legitimate goals, including the Debtors' goal to restructure their debt and successfully emerge from chapter 11 as a viable airline.

## ARGUMENT

A. <u>An Equity Committee Should Not Be Appointed</u>

2. It has been abundantly clear from the commencement of the Debtors' chapter 11 cases that there is no realistic possibility that there could be a distribution to equity holders under a plan of reorganization in these cases. Although the voluntary petitions commencing these chapter 11 cases as amended, listed, as of March 31, 2002, the total balance sheet assets of the estates as $7.807 billion and the total balance sheet liabilities of the estates as $10.65 billion, the August 16, 2002 Form 8-K filed by the Debtors with the Securities and Exchange Commission (the "SEC") presents a clearer picture of the Debtors' debt. In that 8-K, the Debtors reported $10.65 billion in balance sheet liabilities as of March 31, 2002 and noted that additional

obligations,[1] when taken together with the stated liabilities, aggregate $16 billion. That 8-K reflects assets of only $7.8 billion as of March 31, 2002. From March 31, 2002 through September 30, 2002, according to the Forms 10-Q filed by the Debtors for the second and third quarters of 2002 (dated August 16, 2002 and November 14, 2002, respectively), substantial losses were incurred aggregating approximately $583 million. Worse still, since the Filing Date the overall industry outlook has "soured" and there is little doubt that the value of the March 31, 2002 assets has declined. Clearly, with obligations of more than double the value of the assets, there could be no conceivable distribution to equity holders. Despite the improvement in the proposed distributions to general unsecured creditors discussed below, while general unsecured creditors on a fully diluted basis are proposed to receive 10.5% of the value of the reorganized Debtors, the distribution on account of their claims is very modest. There simply is no value to distribute to equity holders. The formation of an equity security holders' committee (an "equity committee") would not change this outcome. Under the circumstances it would serve no legitimate purpose and could only burden these estates with unnecessary costs and possibly delay the proceedings.

3.  The decision of whether to appoint an equity committee is discretionary. In the first instance it is within the discretion of the United States Trustee (the "US Trustee"). 11 U.S.C. §1102(a)(1). Thereafter, "on request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure the adequate representation of creditors or of equity security holders." Emphasis added.

---

[1] These obligations are comprised of approximately $4 billion in "off balance sheet" liabilities with respect to the net present value of aircraft operating leases and approximately $1.5 billion in cash commitments related to aircraft acquisition obligations. It should be noted that the SEC Form 10-K for the year ending 2001 filed by the Debtors on March 28, 2002 also reflected these obligations.

11 U.S.C. §1102(a)(2). "The appointment of an official equity committee should be the rare exception. Such committees should not be appointed unless equity holders establish that (i) there is a substantial likelihood that they will receive a meaningful distribution in the case under a strict application of the absolute priority rule, <u>and</u> (ii) they are unable to represent their interest in the bankruptcy case without an official committee." Emphasis added. <u>See</u> <u>In re Williams Communications Group, Inc.</u>, 2002 WL 1751051 at *6 (Bankr. S.D.N.Y. Jan. 24, 2002). Furthermore, the burden is on the moving party to establish that an equity committee is necessary. <u>See</u> <u>In re Edison Brothers</u>, 1996 WL 534853 at *4 (D. Del. Sept. 17, 1996); <u>In re Johns-Manvillle Corporation</u>, 68 B.R. 155, 158 (S.D.N.Y. 1986). Earlier in these cases, after properly considering the issue, the US Trustee determined not to form an equity committee and that decision should not be disturbed.

4. Mr. Jones has failed to present any evidence to contradict the conclusion that the Debtors are insolvent and that there is no opportunity for a distribution to equity security holders in these cases. Typically, committees retain legal and financial advisors. It would be inappropriate, in these undeniably insolvent cases, to saddle the estates with expenses that would serve no legitimate purposes but would further deplete the Debtors' resources. "When a debtor appears to be hopelessly insolvent, an equity committee is not generally warranted 'because neither the debtor nor the creditors should have to bear the expense of negotiating over the terms of what is essentially a gift.'" <u>In re Williams Communications Group, Inc.</u>, 2002 WL 1751051 at *6, quoting <u>In re Emons Industries, Inc.</u>, 50 B.R. 692, 694 (Bankr. S.D.N.Y. 1985). We will not burden this Court with a discussion of whether Mr. Jones or other shareholders can or cannot represent their interests without the formation of an equity committee. The total lack of any economic interest must result in a denial of the request for the formation of an equity committee.

B.  The Remaining Relief Requested Is Vague, Unsubstantiated, Not In the Interests Of The Estates Or Their Creditors And Should Be Denied

5. Mr. Jones makes vague allegations about conversations he had with unidentified representatives of "US Airways' Investor Relations and Corporate Offices of, about and concerning the recovery plan [and] the effect the recovery plan would have on existing equity security holders of U.S. Airways" and that at some unspecified point or points in time these unidentified people gave Mr. Jones reason to believe the company's stock would not be canceled. (Application at paragraphs 3 and 4). The allegations of fraud are in the first instance based on what Mr. Jones believes he was told concerning a public security. Even if Mr. Jones' recollection is correct, the statements when made may have been true. In addition, even if Mr. Jones' recollection is correct and even if the statements were made on the Filing Date, such statements would not constitute grounds for any of the relief requested by Mr. Jones.

6. Although Mr. Jones alleges that the Debtors, their management, their unions, and the plan sponsor have engaged in unfair conduct, conspiracy, fraud and racketeering, there is not one scintilla of evidence to support any of these allegations. The Committee asserts from its own substantial involvement in these cases that the Committee has no reason to believe that the Debtors or any other parties complained of in the Application have engaged in any improper conduct.

7. As the Bankruptcy Court can ascertain from the proceedings held before it, the debtor-in-possession financing and plan sponsor processes were the subject of significant negotiation, modification, notice and were the subject of the Bankruptcy Court's review and approval. Prior to the Filing Date, the Debtors had entered into a memorandum of understanding (the "MOU") with Texas Pacific Group ("TPG") to act as a stalking horse bidder in connection with an equity investment to be made on plan confirmation. Under the terms of the MOU, TPG

had agreed (a) to participate as a lender under a debtor-in-possession facility (the "DIP Facility") with a commitment of up to $100 million out of a proposed $500 million DIP Facility, and (b) to provide a $200 million equity investment in the company. Under the MOU, on a fully diluted basis, TPG would have received approximately 37.5% of the new equity of the reorganized Debtors. At the outset of these cases, the Committee and its professionals reviewed, analyzed, and negotiated the bidding procedures with the Debtors and other parties in interest to facilitate an open, well-balanced bidding process that would afford other parties with a meaningful opportunity to submit competing proposals and, hopefully, produce a greater distribution to the unsecured creditors.

8. As negotiations were underway to improve the bidding procedures, the Retirement Systems of Alabama ("RSA") expressed interest in acting as the stalking horse bidder. After extensive negotiations between the Committee and RSA, and then with the Debtors, a new agreement was reached which provided for (a) the substitution of RSA as the stalking horse bidder, (b) a $40 million increase in the cash bid and (c) the underwriting of the entire $500 million DIP Facility. Under the current version of the agreement with RSA, it would receive 36.5% of the equity in the reorganized Debtors for $240 million and the unsecured creditors would receive an equity stake on a fully diluted basis of 10.5% (up from an initial "guaranteed" stake of 8.5% based on the initial RSA agreement). RSA agreed to waive certain fees which TPG had required in its MOU and which had the potential to cost the estate approximately $10 million. RSA also agreed to provide a $500 million DIP Facility on substantially the same, but better terms than the proposed TPG DIP Facility. Unlike the TPG proposal, if RSA had not ultimately been chosen as the winning plan sponsor, the winning plan sponsor would not have to replace the DIP Facility as was required in the TPG proposal. In addition, RSA agreed to permit

the Debtors to access certain of the DIP Facility funding earlier than they would have been permitted to under the TPG MOU, assuming there were no defaults or failures of other conditions.

9. After the Bankruptcy Court authorized RSA to be the stalking horse bidder and approved the modified bidding procedures and the modified DIP Facility, the sale process was undertaken. The Debtors and their professionals conducted the sale process in accordance with the bidding procedure order entered by the Bankruptcy Court and the Committee's professionals were active in overseeing that process. Ultimately, no bid was received higher or better than RSA's, and RSA was determined to be the winning plan sponsor.

10. The DIP Facility (as originally proposed by TPG and then as entered into with RSA) required that certain "milestones" be met prior to the lender's requirement to fund certain amounts under the DIP Facility. The fourth and final milestone required, among other conditions, (under both the TPG and the RSA DIP Facility) that the Air Transportation Stabilization Board ("ATSB") confirm its conditional approval of a guaranty of $900 million of a proposed $1 billion ATSB loan.[2] The Debtors believe that the ATSB guaranty is vital to their reorganization process. Final ATSB approval is also a condition to the plan sponsor's obligation to close on the stock acquisition transaction. (The original TPG MOU also contained this requirement.) Such conditions make sense because absent such Federal loan guaranty, the viability of the Debtors is far more questionable. Not surprisingly, the General Electric Capital Corporation's global settlement (currently pending before the Bankruptcy Court), which provides for (i) a settlement of claims, (ii) a proposed additional debtor-in-possession financing to be

---

[2] The ATSB loan is a proposed (and conditionally approved) $1 billion loan, that will (subject to final ATSB approval) be guaranteed by the ATSB in an amount equal to $900 million.

made in an amount up to $120 million and (iii) a proposed exit facility and proposed regional jet financing aggregating approximately $710 million in additional financing, also requires, with respect to these financings, the final ATSB loan guaranty approval.

11. The sale process and the various financing efforts described above entailed extensive arms length negotiations as well as an improved open court process. At no time during any of these proceedings did Mr. Jones object to the sale, the sale process, the proposed stalking horse bidder or the substitution of that bidder, the winning plan sponsor or the Debtors' entry into the investment agreement. The process was neither flawed, nor tainted. Any objection to it or request that it be unraveled or RSA be "discharged" as the plan sponsor should be denied.

12. Just as the facts belie the allegations of impropriety with respect to the sale process, they belie the allegations relating to the union negotiations. Whether a shareholder favors a unionized company or not, once collective bargaining agreements have been entered into by a company and a union, the company is obligated thereunder. As of the Filing Date, the Debtors had approximately 40,000 employees, many of whom have the benefit of collective bargaining agreements, and significant obligations owed to the employees and unions. The Debtors must, if they are to reorganize, substantially reduce costs, including unionized and non-unionized employee costs. Absent achieving these cost savings, which are necessary to achieving their business plan, maintaining their financing and obtaining exit financing, including financing guaranteed by the ATSB, the Debtors' reorganization efforts will fail. The Bankruptcy Code provides mechanisms to help debtors achieve these goals including the power to reject certain agreements. However, prior to the rejection of a collective bargaining agreement, the Bankruptcy Code requires a debtor to enter into good faith negotiations to modify that agreement. Consistent with both their obligations and with their reorganization goals, the Debtors have

engaged in extensive negotiations with their unions. The Debtors have been extremely successful in these negotiations and have achieved not one, but two rounds of cost savings. The salary, work rule and employee benefit labor cost savings achieved by the Debtors with respect to their union and non-union employees aggregates approximately on average $1 billion per year over a six and a half (6 ½) year period. The negotiations and the savings that they produced are indicative of a cooperative effort by management and labor to reorganize the Debtors and strike a fair balance between the needs of the employees and the cost saving needs of the Debtors. As noted above, the unfortunate economic reality is that absent these (and other) cost savings, the Debtors will be unable to achieve their business plan, obtain final approval of the ATSB guaranty or reorganize. Cold hard numbers are compelling negotiating tools. Successful negotiations are not evidence of conspiracy.

13. As Mr. Jones admits, the absolute priority rule requires that the general unsecured creditors be paid in full prior to any distribution being made on account of equity interests. As discussed above, there is simply insufficient value to permit any distribution to shareholders on account of their equity security interests. However, that does not preclude a consensual plan of reorganization from providing ongoing management with an equity stake in the reorganized Debtors. Such a provision is quite common in corporate reorganizations and, in fact, contrary to Mr. Jones' assertions, was contemplated in the TPG MOU. After substantial negotiation, the plan of reorganization that has been proposed by the Debtors includes a grant of equity to ongoing management in an amount of approximately 2% of the value of the reorganized Debtors on a fully diluted basis <u>less</u> than proposed in the TPG MOU. This grant is intended to provide an incentive to and compensate management. It is important that ongoing management be "incentivised" as it will be responsible for maintaining, and hopefully enhancing, the value of the

new stock. To date, there has been <u>no</u> retention bonus program implemented in these cases for senior management although such bonuses are quite common in large chapter 11 proceedings. Furthermore, if any party is impacted by these grants to management it is the general unsecured creditor class and not equity holders. Similarly, the plan proposes to provide the various unions with grants of equity in exchange for the "give-up" of future benefits that the unions would have been entitled to, but for the consensual modification of the collective bargaining agreements. Negotiating and proffering a plan of reorganization that provides for such stock grants is not evidence of conspiracy, but evidence of the exercise of the Debtors' fiduciary duties.

14. There is nothing actionable in any of the foregoing. However, even if there were, Mr. Jones' claims arising out of any fraud or improper action would be subject to subordination under Section 510(b) of the Bankruptcy Code, whose policy is "to prevent disappointed shareholders from recovering their investment loss by using fraud and other securities claims to bootstrap their way to parity with general unsecured creditors in a bankruptcy proceeding." <u>In re Telegroup</u>, 281 F.3d 133, 142 (3rd Cir. 2002).

## **Conclusion**

15. The Committee urges this Court to deny each and every prayer for relief in the Application. There has been no showing that the Debtors, the plan sponsor, the unions or any other parties during these cases have in any way abrogated or violated the Bankruptcy Code, other laws, their fiduciary and other duties, or acted in any way inappropriate with respect to the chapter 11 Debtors and their estates. Evidence abounds that the Debtors have undertaken a cooperative effort on a fast track to reorganize. Much has been accomplished. In a little more than four months, a plan of reorganization and disclosure statement have been filed. Much more needs to be accomplished if the Debtors are to succeed. The Debtors have grappled mightily

with a very difficult economic environment and a challenging debt structure to reorganize the business of the seventh largest airline in the United States, save jobs, and emerge as an economically viable company.  An "out of the money" investor should not be permitted to distract the Debtors from the task at hand because such action could only delay and quite probably prevent a successful reorganization.

**WHEREFORE,** the Committee respectfully requests that this Court enter an Order denying each and every request for relief contained in the Application and granting the Committee such other and further relief as it deems proper.

Dated: New York, New York
January 9, 2003

                              Respectfully submitted,

                              /s/ Scott L. Hazan
Scott L. Hazan
Brett H. Miller
OTTERBOURG, STEINDLER,
HOUSTON & ROSEN, P.C.
230 Park Avenue
New York, New York 10169
Tel:  (212) 661-9100
Fax: (212) 682-6104
Lead Co-Counsel for the
Official Committee of Unsecured Creditors

                              and

                              /s/ Malcolm M. Mitchell, Jr.
Malcolm M. Mitchell, Jr., (VSB No. 18098)
Vorys, Sater, Seymour and Pease LLP
277 South Washington Street, Suite 310
Alexandria, Virginia 22314
(703) 837-6999
Local Co-Counsel for the
Official Committee of Unsecured Creditors

# CERTIFICATE OF SERVICE

I, Malcolm M. Mitchell, Jr., do hereby certify that, on January 9, 2003, I caused a copy of the Objection of the Official Committee of Unsecured Creditors of US Airways Group, Inc., <u>et al.</u> to the Application of Chuck Jones for (A) Appointment of Shareholder Committee; (B) Appointment of a Trustee or Examiner; (C) Removal of DIP for Bad Faith Acts and Unjust Enrichment; (D) Rejection of Plan of Reorganization as Inadequate and for Violation of Absolute Priority Rule; (E) Equitable Subordination of Distribution of Shares to Management and Unions; (F) To Discharge Plan Sponsor; (G) For Stay of Chapter 11 Proceedings; (H) For Permission to File Adversary Proceedings; and (I) Alternatively to Dismiss Chapter 11 to be served (a) on the parties listed on the Master Service List* attached hereto as Exhibit A, via overnight delivery; (b) on the parties listed on the 2002 Service List* attached hereto as Exhibit B, via electronic mail delivery; and (c) on the parties listed on the Service List* attached hereto as Exhibit C, via overnight delivery.

/s/ Malcolm M. Mitchell, Jr.
Malcolm M. Mitchell, Jr.

*Pursuant to Local Rule 5005-1(C)(8), the attached service lists are not being served on each of the parties, but are attached to the original Certificate of Service filed with the Court.